UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GODFRIE COLE,

Defendant.

No. 24 Cr. 57 (PAE)

## DEFENDANT'S SENTENCING MEMORANDUM

Tamara L. Giwa, Esq.
Executive Director
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Counsel for Godfrie Cole*

Siobhan C. Atkins
*Of Counsel*

To:   Jay Clayton, Esq.
      United States Attorney
      Southern District of New York
      26 Federal Plaza
      New York, New York 10278

      Attn:  Brandon Harper, Esq.
             Assistant United States Attorney
             Southern District of New York

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

April 14, 2026

**By ECF and Email**

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   **United States v. Godfrie Cole**, 24 Cr. 57 (PAE)

Dear Judge Engelmayer:

Starting at the age of 12, the now-25-year-old Godfrie Cole has suffered from severe, persistent mental illness. That illness caused him to self-medicate; drove his involvement in the criminal justice system as a child; and motivated the instant offense. His sickness—and how to treat it—is thus the chief consideration in determining Mr. Cole's sentence.

And BOP custody is not the proper environment for someone with Mr. Cole's level of mental illness. Now that Mr. Cole's family recognizes the true scope of his sickness, and now that Mr. Cole has their support and that of this office, he can access wraparound care in the community that he has never accessed before. I thus respectfully ask that this Court vary from the Guidelines range and impose a sentence of 48 months' imprisonment, to be followed by 3 years of supervised release.

## I.      Background

***Mr. Cole was born into difficult circumstances.***

Godfrie Cole was born in August 2000. (PSR ¶ 74). Life was difficult from the earliest days: ███████████████████████████████████████████████████ ███████████████████████████████████████. (PSR ¶ 77). Mr. Cole was also born without a father, as his dad Howard Turner was deported to Jamaica before he was born. (PSR ¶ 76). While Mr. Cole's mother Anne reports that

Honorable Paul A. Engelmayer                                April 14, 2026
United States District Judge                                      Page 2

now, Mr. Cole's father "will talk to Mr. Cole sternly to try to set him on the right
path," (Ex. A, Letter of Anne Cole), Mr. Cole's dad did not help provide for him
during his childhood (PSR ¶ 76).

From the time he was a child, his family noted Mr. Cole's compassion. As his
mother Anne writes, "Godfrie's kindness is my favorite quality of his. He was
always kind to older people on the road, he would buy them coffee or things like
that. If he sees someone struggling, he would try to help them." (Ex. A, Letter of
Anne Cole). His siblings say the same thing: His brother Keon, with whom he's
spent extensive time both as a kid and as an adult, reports that he's "naturally a
good person." (Ex. B, Letter of Keon Cole). And his twin sister Angel says that he
has "such a good heart." (Ex. C, Letter of Angel Cole).

But Mr. Cole's childhood was chaotic. When he was 4, he accidentally lit
himself on fire while playing with a lighter, and sustained burns all over his body.
(PSR ¶ 80; BOP Competency Update at 6).[1] Rather than take him to the hospital,
his mother attempted to treat Mr. Cole's injuries herself. (PSR ¶ 80). Mr. Cole still
carries a burn mark on the right side of his abdomen. (PSR ¶ 87). Mr. Cole was also
hit by a car when he was a child, after another kid pushed him into the street. (PSR
¶ 88). According to medical records obtained by the BOP, █████████████████
████████████████████████████████████████████████████

The danger Mr. Cole faced did not end when he went to sleep. Starting when
he was 12, █████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ It is unclear what parts of this experience arise out of mental
illness, but his terror—and confusion—is palpable and real. (PSR ¶ 81).

Mr. Cole also struggled mightily in school. He was placed in special education
classes from an early age—beginning in the second grade—because he had trouble
learning, understanding, and staying still in class. (PSR ¶ 103; Competency Report
at 4). Mr. Cole had to repeat both the second and third grades, and he was soon

---

[1] Citations to the forensic evaluation submitted by the BOP on October 17, 2025 are
preceded by "BOP Competency Update." Citations to the original competency
evaluation conducted by Cheryl Paradis are preceded by "Competency Report."

Honorable Paul A. Engelmayer                                   April 14, 2026
United States District Judge                                          Page 3

███████████████████████████████████████. (PSR ¶ 103). These early learning problems affected him for the rest of his life: At age 15, his English skills were at a 2nd grade level and his math skills were at 5th grade level. (Ex. D, DOE Records).

> ### *Mr. Cole began self-medicating with marijuana at age 9 and descended into mental illness only a few years afterwards.*

Mr. Cole began self-medicating with marijuana while his age was still in the single digits—at age of 9. (PSR ¶ 96). And just a few years later, at age 12, Mr. Cole started using synthetic marijuana—K2. (PSR ¶ 96). He smoked marijuana or synthetic marijuana at least once a day up until the time he was arrested on this case. (PSR ¶ 96).

Research shows that using drugs as an adolescent not only increases the risk for later substance abuse disorder; it's also an "additional risk factor for the appearance of psychotic symptoms." (Ex. E, Reentry Plan, at 2). And that's what happened to Mr. Cole: soon after beginning to smoke K2, ██████████████████ (Ex. F, Bowen Center Record; *see also* BOP Competency Update at 6). Indeed, Mr. Cole would later report that "he use[d] to smoke K2 when he was a teenager which is when he started to notice the change in his behavior." (Ex. F, Bowen Center Record). He said, '████████████████████████████████████████████ (Ex. F, Bowen Center Record). At age 12, Mr. Cole was ████████████████████████████████████████████████████████

> ### *Mr. Cole's past crimes are attributable to untreated mental illness.*

In those difficult early teenage years—██████████████████████, using drugs to cope, and ██████████████████—Mr. Cole committed acts of juvenile delinquency. As a result, he was taken from his home and from any semblance of a support system: He was sent to a nonsecure detention facility starting at age 14. (Ex. E, Reentry Plan, at 2). As Anne put it, "I sent him away to a group home for a while." (Ex. A, Letter of Anne Cole).

The time in group homes did not help him. As Angel Bosques, LCSW, notes, "For a young boy, being separated from his home, trying to live a life navigating his mental illness, and living in a treatment institution for months are experiences that do not set up a young man for success." (Ex. E, Reentry Plan, at 2). "These facilities

Honorable Paul A. Engelmayer                                       April 14, 2026
United States District Judge                                             Page 4

[were not] successful to treat his mental illness and ... only placed the proverbial Band-Aid on a broken bone." (Ex. E, Reentry Plan). Even his return home after his time in the group home proved chaotic: When he was around 15 years old, his family was evicted from their apartment, and they lived in a shelter for about a year. (PSR ¶ 77).

At the age of 16, he committed crimes that landed him in the adult criminal justice system—committing one robbery at the age of 16 and another at the age of 17. (PSR ¶¶ 61, 62). Recognizing Mr. Cole's young age, and after considering other mitigating factors, *see* N.Y. C.P.L. § 720.20, Mr. Cole was adjudicated a youthful offender for both offenses. (PSR ¶¶ 61, 62). But he still "served a sentence ... in an adult prison." *United States v. Driskell*, 277 F.3d 150, 154 (2d Cir. 2002).

Mr. Cole's time in state adult custody exacerbated his mental health issues. When he was 17 and in a New York jail, ██████████████████████████ ████████████████████████████████████████████████████████████

Mr. Cole's family struggled to make sense of his involvement in the criminal-justice system. Mr. Cole's mother attributed many of his problems to being a teenager: As she explained, he "would hang around the wrong kids and would end up in and out of jail." (Ex. A, Letter of Anne Cole). And as Mr. Bosques notes, his family trusted that Mr. Cole would get the proper care for his mental health in custody: "They naively believed he would eventually get help from these various systems that he was involved in." (Ex. E, Reentry Plan, at 1).

Most recently, Mr. Cole was charged with an attempted robbery in 2022, after he attempted to steal an e-bike. He admitted to the crime; was sentenced to a few months in jail and term of probation; and told officials that he was ████████ ████████████████████████████████ when he committed the attempted robbery (see Ex. G, Probation Record; *see also* PSR ¶ 90 (noting that Mr. Cole had not taken his prescribed medication on the day of the robbery). Still, given his psychosis and difficulties with following up on care, he struggled to get the kind of mental-health treatment that he needed even while on state probation. After being referred to a mental-health clinic by New York's probation office, ██████████████ ████████████████████████████████████████████████████████████

████████████████ (Ex. E, Reentry Plan, at 2–3). "Being unmedicated, without proper advocacy, and lack of familial support led to him failing this program after only one month." (Ex. E, Reentry Plan, at 2–3).

And meanwhile, Mr. Cole continued to decompensate. A few years before he was arrested on this case, his brother Keon reported an incident that left "him in tears": Mr. Cole "came home, rang the bell, and was barefoot with no clothes on in the middle of the winter." (Ex. E, Reentry Plan, at 2). ████████████████

██████████████████████████████████ *see* Competency Report at 6–7)—his family began to wake up to the reality of Mr. Cole's mental illness. As Anne Cole puts it:

> There was a day a few years ago, before this case, when Godfrie was out the house for a while and we couldn't find him. His brother, Keon, went out looking for him and when he found him, Godfrie was spazzing out. Apparently, the person Godfrie was smoking with died that day from what they were smoking. I thank God that he saved my son's life. ████████████████
>
> ████████████████████████████

(Ex. A, Letter of Anne Cole).

## II.   Offense Conduct, Mr. Cole's Nearly Two and a Half Years in Prison, and His Plans for the Future

It was in that context that Mr. Cole committed a robbery of a convenience store with another person in late November 2023. He was suffering from psychosis during this time: Only a few months before the offense, a clinician wrote that Mr. Cole ████████████████ (Competency Report at 7). And he ████████████████

████████████████ (Competency Report 7). Mr. Cole's condition was so severe that Your Honor found that he was unable to assist in his defense. He was admitted to FMC Butner and was restored to competency in October 2025, at which point he was transferred back to MDC.

Honorable Paul A. Engelmayer                                          April 14, 2026
United States District Judge                                                Page 6

The conditions Mr. Cole has faced while at Butner and at MDC, for the past two and a half years, have been horrifying. At various points, he was "on suicide watch in a cold and desolate cell with only a paper smock as clothing, in special housing units isolated from other people, and in a medical facility where he was tied from each limb and given heavy doses of psychiatric medications." (Ex. E, Reentry Plan, at 3–4). Mr. Cole's extensive time in SHU was due to the numerous tickets he amassed, as he likely experienced "heighten[ed] feelings of fear and mistrust" and was simply unable to conform his behavior to prison. Prins, S. J. (2022). *Prevalence of mental illnesses in U.S. state prisons: A systematic review*. Psychiatric Services, 73(3), 283–292. Mr. Cole's experience aligns with that of many severely mentally ill inmates: The average male prisoner with serious mental illness spends three times longer in solitary confinement compared with a similar man with no history of mental illness. Jessica T. Simes, Bruce Western & Angela Lee, *Mental Health Disparities in Solitary Confinement*, 60 CRIMINOLOGY 538, 558 (2022).

Because of Mr. Cole's frequent disciplinary sanctions—and his inability to convey to others whom to contact on his behalf—Mr. Cole's family did not know where he was for over a year. As Anne explains, "[W]e went almost 1.5 years without hearing his voice or seeing him because he had been moved from the MDC and we didn't know what was happening. We didn't get a call that they moved him. It was so horrible because if they took my child and killed him or did anything to him, I don't know if I'd know." (Ex. A, Letter of Anne Cole).

All that changed at Mr. Cole's plea. This office was finally able to make contact with Mr. Cole's family, and his mother and siblings took the day off work to be there to support him. As Mr. Bosques notes, "There has been a change in Mr. Cole since he sat before Your Honor in January 2026. The difference was that he saw and spoke with his family for the first time in over two years in the courtroom. This provided comfort for Mr. Cole in seeing that his family will be there for him in his most difficult time." (Ex. E, Reentry Plan, at 4).

Since then, Mr. Cole has returned to general population and has been able to resume frequent contact with his family. He calls his mother regularly—calls that Anne looks forward to (Ex. A, Letter of Anne Cole)—and he speaks to his brother Keon every other day. And they are all looking forward to a future where Mr. Cole is not behind bars.

Mr. Cole has told me he looks forward to the simple things—just being able to sit quietly on the couch, far away from the stress and chaos of prison. And his whole family says that they are behind him and ready to support him. As part of the reentry plan proposed by Mr. Bosques (*see* Ex. E), they have made clear that they are prepared to be a crucial part of his support system. His twin sister Angel says, "I will always be here to help him." (Ex. C, Letter of Angel Cole). And his brother Keon says:

> I don't feel like jail time will help him if I'm being honest. He's been in there long enough and I think he needs to be rehabilitated on the outside. He needs to be around his family and not in jail. He lived with me before and he will definitely have a place to stay with me again after this case. He won't have to worry about nothing, he'll eat for free and will have clothes on his back until he figures out what he wants to do with himself.

(Ex. B, Letter of Keon Cole).

## III.   Sentencing Guidelines

In fashioning an appropriate sentence, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." *Id.* "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." *Id.* The Court may not presume that the advisory Guidelines range is reasonable and must instead "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). In making this assessment, "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d, 107, 121 (2d Cir. 2017).

Probation has calculated Mr. Cole's Guidelines range to be 151 to 188 months, largely driven by its determination that Mr. Cole is a career offender because of offenses he committed when he was 16 and 17 years old. This submission does not dispute the accuracy of Probation's calculation. However, for a number of reasons—including Mr. Cole's young age at the time of his prior offenses, his severe

Honorable Paul A. Engelmayer                                    April 14, 2026
United States District Judge                                         Page 8

mental illness, and Mr. Cole's expectations as part of the plea—counsel respectfully submits that the range of 63 to 78 months in the plea agreement should provide a starting point for this Court's sentencing.

### *The parties' plea agreement should provide a starting point for this Court's sentencing: it warrants a significant variance.*

The Second Circuit has long recognized that courts have discretion to depart or vary from the Guidelines in order to conform to the parties' plea agreement. In *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989), for example, the Second Circuit recognized that a district court "may depart from a Guidelines sentence in order to give effect to a plea bargain." *Id.* at 1145. The Court recognized that in certain circumstances, strict adherence to the Guidelines would "threaten to make the widespread practice of plea bargaining unworkable," and that "weakening the plea bargaining system" was not "part of Congress' intent in passing the Sentencing Reform Act." *Id.* at 1144–45. As such, "district courts retain discretion to give effect to the Guidelines range anticipated in a plea agreement by departing downward from a corrected Guidelines range in appropriate circumstances." *United States v. Torres*, No. 21-562, 2022 WL 1669633, at *2 (2d Cir. May 26, 2022).[2]

Varying downwards—with a range of 63 to 78 months as the court's starting point—is particularly appropriate here. The plea agreement drafted by the government did not consider Mr. Cole a career offender—and in fact, considered him to only have a Criminal History Category of II. (*See* Ex. H, Plea Agreement). And the government made that representation while knowing full well about Mr. Cole's youthful-offender adjudications: they were described at length in the Pretrial Services report prepared upon Mr. Cole's arrest. In order to fulfill Mr. Cole's reasonable expectations, then, this Court should vary downwards significantly—such that 63 to 78 months, not the higher range calculated by Probation, is the

---

[2] Although *Fernandez* and its progeny were decided under a prior version of the Guidelines—which spoke of departures, not variances—it remains good law. *See, e.g.*, U.S.S.G. Chapter One, Part A, Introduction and Authority (Nov. 1, 2025) (noting that while "the Commission amended the Guidelines Manual to remove departures," it was "intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)").

Honorable Paul A. Engelmayer                                    April 14, 2026
United States District Judge                                            Page 9

Court's starting point for deciding Mr. Cole's sentence. *See also United States v. Almanzar*, 25-cr-665 (SDNY) (NRB) (sentencing defendant to term within the range contemplated in the plea agreement, where plea agreement did not consider the defendant a career offender but Probation did).

Using the range contemplated in the plea agreement—one that did not consider Mr. Cole a career offender—is even more appropriate given the ever-shifting legal landscape around career offender status as applied to Hobbs Act robbery. After the Second Circuit's decision in *United States v. Chappelle*, 41 F.4th 102, 105 (2d Cir. 2022), and before November 1, 2023, Hobbs Act robbery was not a crime of violence under the career-offender Guidelines, § 4B1.2. On November 1, 2023, however, the Sentencing Commission "amended parts of § 4B1.2—the Guidelines section defining terms used to assess § 4B1.1(a)'s Career Offender designation—in a manner that designates Hobbs Act robbery a crime of violence." *United States v. Diaz*, 768 F. Supp. 3d 369, 374 (E.D.N.Y. 2024).

Had Mr. Cole's offense conduct occurred only a few weeks earlier, then—on October 30, 2023, rather than November 30, 2023—he would not be considered a career offender at all. *See Peugh v. United States*, 569 U.S. 530, 533 (2013) (holding that "there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense"); § 1B1.11(b)(1) (directing courts to "use the Guidelines Manual in effect on the date that the offense of conviction was committed" if using the Manual in effect at the time of sentencing would violate the *ex post facto* clause). To avoid arbitrary results, then, this Court should apply the range contemplated in the parties' plea agreement.

### *Mr. Cole's youth at the time of his prior offenses warrants a variance.*

A variance is also warranted because of Mr. Cole's young age at the time of his prior offenses. Indeed, as Probation itself recognizes, its designation of Mr. Cole as a career offender stems entirely from two offenses he committed when he was a child: one robbery committed at age 16 and another committed at age 17. By Probation's calculation, then, Mr. Cole was a career criminal before he could even open a bank account, vote, or serve in the military.

While the Second Circuit ruled over 20 years ago that youthful offender adjudications like Mr. Cole's are predicates for career-offender status, *see United*

*States v. Jones*, 415 F.3d 256, 264 (2d Cir. 2005), many scholars have since noted how absurd it is to treat them as such. Among other things, the Second Circuit's holding "stands in tension with the U.S. Supreme Court's 'juveniles are different' jurisprudence." Ian Marcus Amelkin, Nicholas Pugliese, *The Delinquent Guidelines: Calling on the U.S. Sentencing Commission to Stop Counting Defendants' Prior Offenses Committed Before Age 18*, 19 HARV. L. & POL'Y REV. 1, 21 (2024). The Supreme Court has recognized youth's "diminished culpability" compared to adults: their "lack of maturity and ... underdeveloped sense of responsibility": their susceptibility to negative influences and peer pressure; and their capacity for real, lasting change. *Roper v. Simmons*, 543 U.S. 551, 576-78 (2005). *Jones* and similar cases also stand in some tension with the Second Circuit's later ruling in *United States v. Sellers*, 784 F.3d 876 (2d Cir. 2015), which held that youthful-offender adjudications are not predicates under ACCA because, among other things, ACCA—just like the Guidelines—require "district courts to apply state law in evaluating prior state convictions." *Id.* at 884.

While Your Honor is bound by the Second Circuit's interpretation of the Guidelines, it can and should nevertheless vary from the Guidelines based on the fact that Mr. Cole was a child at the time of his prior offenses. Indeed, the 2024 version of the Guidelines expressly recognized that a downward departure may be warranted because of a defendant's young age "at the time of … prior offenses." U.S.S.G. §5H.1.1 (Nov. 1, 2024). While the Guidelines now speak only of variances, not departures, the Guidelines manual applicable to Mr. Cole states that "judges who would have relied upon facts previously identified as a basis for a departure ... continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G. Chapter One, Part A, Introduction and Authority (Nov. 1, 2025)

As basis for the departure—now variance—the Guidelines recognized that "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." U.S.S.G. §5H.1.1 (Nov. 1, 2024). The Guidelines also acknowledged certain "risk factors" that "may affect a youthful individual's development into the mid-20's and contribute to involvement in the criminal justice systems," U.S.S.G. §5H.1.1 (Nov. 1, 2024), including "environment, adverse childhood experiences, substance use," and "lack of educational opportunities." All of those factors—especially when compounded by his

severe, untreated mental illness—help explain Mr. Cole's early involvement in the criminal justice system here.

> ### Most importantly, Mr. Cole warrants a significant variance because of his severe mental illness.

Finally, and most importantly, even Probation agrees that Mr. Cole warrants a significant variance because of his severe, persistent mental illness. He was diagnosed █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

His family struggled to understand the severity of his illness. And his illness has never, to this day, been treated in a comprehensive way. (*See* Ex. E, Reentry Plan, at 2). Because both his past crimes and the current one are attributable to that untreated psychosis, he warrants a significant variance.

The Guidelines have long recognized that a departure—now variance—may be appropriate for those with mental illness. The point of such a departure or variance "it to treat with lenity those individuals whose 'reduced mental capacity' contributed to commission of a crime." *United States v. Chatman*, 986 F. 2d 1446, 1452 (D.C. Cir. 1993). Such lenity is appropriate because "two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity." *Id.*

"As to desert, persons who find it difficult to control their conduct do not—considerations of dangerousness to one side—deserve as much punishment as those who act maliciously or for gain." *Id.* (quotations omitted). As Judge Posner recognized, "whatever the prognosis of a mental illness, a person who acts under the effect of diseases is not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired." *United States v. Dyer*, 216 F.3d 568, 571 (7th Cir. 2000); *see United States v. Miranda*, 505 F.3d 785, 793–94 (7th Cir. 2007).

In addition, "mental illness . . . might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant deterrent effect on persons in the defendant's class." *Miranda*, 505 F. 3d at 793; *see Chatman*,

Honorable Paul A. Engelmayer                                      April 14, 2026
United States District Judge                                          Page 12

986 F.2d at 1452 ("Because legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction." (quotations omitted)).

Those with mental illness also face much harsher conditions while in prison. Individuals with mental illness are at much higher risk of victimization, with 1 in 12 male detainees with mental illnesses suffering from sexual victimization. M. Mullan, *How Should Mental Illness Be Relevant to Sentencing?*, 88 MISS. L.J. 255, 264 (2019) (citations omitted). They are also disproportionately punished by solitary confinement; they suffer from suicides at a higher rate; and they experience higher rates of violent disciplinary action by prison staff, all of which "results in a deterioration in the psychiatric condition, and in turn, the prisoner with a mental illness experiences a harsher sentence." *Id.* (citations omitted).

All of those rationales warrant a lesser sentence for Mr. Cole. He committed the robbery here while ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ His crime could not have been the product of cold-blooded calculation or malice, and in the nearly two and a half years he has been incarcerated, he has faced harsh conditions that few inmates have. At various points, he has been forcibly medicated; on suicide watch; in special housing units; and in four-point restraints. (Ex. E, Reentry Plan, at 3–4). A lengthy additional prison term is not necessary to either punish him or deter him from future crimes. What is needed is proper treatment.

## IV. A sentence of 48 months' imprisonment is sufficient, but not greater than necessary.

Given the § 3553(a) factors—and the numerous reasons why a variance is warranted—I respectfully submit that a sentence of 48 months' imprisonment, to be followed by 3 years of supervised release, is appropriate in this case. Such a sentence would avoid unwarranted disparities among defendants who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6)) and ensure that Mr. Cole receives necessary medical treatment (18 U.S.C. § 3553(a)(2)(D)).

As mentioned above, a longer sentence is not needed to deter Mr. Cole or punish him, given his severe mental illness. Further, 48 months in harsh conditions—much of it in solitary confinement or being forcibly medicated— appropriately reflects the seriousness of his crime. And on protecting the public: Mr.

Honorable Paul A. Engelmayer                                    April 14, 2026
United States District Judge                                         Page 13

Cole will need to be released at some point, regardless of the length of the sentence Your Honor imposes. Because Mr. Cole's offense stems from his untreated illness, having Mr. Cole in the community, receiving long-overdue proper treatment, is far safer than warehousing him where he will only get worse. In sum, then, a 48-month sentence would be "'sufficient, but not greater than necessary.'" *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting 18 U.S.C. § 3553(a)).

### *Similar—or lesser—sentences have been imposed on other individuals convicted of Hobbs Act robbery.*

Few defendants have had mental health issues—particularly ones this severe— at as young of an age as Mr. Cole. As such, his case is unique in many ways. But it is worth noting that many defendants in this district have received sentences of 48 months or less for worse conduct—and typically without the mitigating factors in Mr. Cole's case. *See, e.g.*:

- *United States v. Taylor*, 18 Cr. 701 (VM), Dkt. No. 23 (June 7, 2019) (sentencing defendant to 36 months' imprisonment and 12 months' inpatient drug treatment when he had committed a string of robberies with a device that appeared to be a firearm, after having served 15 years for firing a gun and injuring two people and 9 years for manslaughter when someone died during a previous armed robbery and the Guidelines were 63 to 78 months' imprisonment);

- *United States v. John Garcia*, 19 Cr. 593 (PAC), Dkt. Nos. 22, 23 (sentencing defendant to 48 months, where the offense involved five robberies of cell phone stores at gunpoint with threats to kill and on two occasions, while racking the slide on the gun, and the Guidelines were 110 to 137 months).

- *United States v. Castillo*, 17 Cr. 413 (JMF), Dkt. Nos. 20, 22 (Feb. 6, 2018) (sentencing defendant to 36 months' imprisonment and 12 months drug treatment when he committed four robberies—and brandished a firearm in all of them—and his Guidelines were 87 to 108 months);

- *United States v. Marshall*, 23 Cr. 359 (LAK), Dkt. Nos. 27, 30 (Apr. 10, 2024) (sentencing defendant to 36 months in prison for 3 bank robberies in which the defendant used notes that said he had a bomb,

Honorable Paul A. Engelmayer                                   April 14, 2026
United States District Judge                                        Page 14

threatened injury, and in one, added an oral threat, when the
Guidelines were 57 to 71 months).

### *The BOP cannot effectively manage Mr. Cole's mental illness.*

The Court must impose a sentence that provides "the defendant with needed .
... medical care ... in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).[3] For Mr.
Cole, this factor carries particularly great weight in warranting a lesser sentence.

The Bureau of Prisons (BOP) is unable to provide effective medical care for
those, like Mr. Cole, suffering from severe mental illness. The Department of
Justice Office of the Inspector General found in 2024 that, in facility after facility,
BOP medical services cannot reliably monitor drug levels or provide timely access to
specialists. At FMC Devens, a designated federal medical center, only one dedicated
physician remained to care for over 900 incarcerated persons; the Deputy Chief
Psychologist position as well as 13 of 33 Psychology Services Department positions
sat vacant; and only half of pharmacy positions were filled, leading to, among other
things, potentially dangerous medication distribution. *See* DOJ OIG, *Inspection of
FMC Devens,* Report No. 25-009, at i, 12 (2024). Correctional officers also "failed to
complete about half of the required inmate-monitoring rounds in the housing units
that [held] vulnerable inmates at the highest ... mental health care levels" and
facility spaces designed to develop those with serious mental illnesses "had yet to be
used ... since its construction 3 years prior to [2024].". *Id.* at ii. At FCI Lewisburg,
the clinical director was abruptly discontinuing mental health medications, creating
severe psychiatric risks, and not meeting with incarcerated persons regularly
enough to make sound prescription decisions and keep patients informed. *See* DOJ
OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution
Lewisburg*, Report No. 24-113, at 11–12 (2024).

Even putting aside clinical staff shortages, BOP's more general staffing
shortages impair its ability to provide treatment for mental health needs and
substance abuse disorders. *See* DOJ OIG, *Evaluation of Issues Surrounding Inmate
Deaths in Federal Bureau of Prisons Institutions*, Report No. 24-041, at 65 (2024).

---

[3] Note that while this is a factor that can warrant a *lesser* prison sentence, the
Court cannot *lengthen* Mr. Cole's prison sentence to provide him with necessary
medical care. *See United States v. Tapia*, 564 U.S. 319, 332 (2011); 18 U.S.C.
§ 3582(a) (instructing judges that "imprisonment is not an appropriate means of
promoting correction and rehabilitation").

Honorable Paul A. Engelmayer                                                April 14, 2026
United States District Judge                                                    Page 15

Among other things, BOP does not adequately address or monitor incarcerated persons with mental illness in restrictive housing. *See* DOJ OIG, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, Report No. 17-05, at 15 (2017).

> ***Mr. Cole's reentry plan provides support and consistency that he has been lacking before.***

It's clear, then, that the BOP does not have the ability to manage Mr. Cole's illness effectively or sustainably. It is also clear that Mr. Cole's illness has never been managed effectively before. Despite ███████████████████████ ██████████████████████████████████████ all prior attempts to treat his illness have been incomplete at best.

His latest stint in New York state probation is a prime example: Even though Mr. Cole told officials that he was ██████████████████████████ ████████████ when he committed the attempted robbery (*see* Ex. G, Probation Record) he never received the hands-on, follow-through treatment he needed. After being referred to a mental health clinic, Mr. Cole ███████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████

Ex. E, Reentry Plan, at 2–3. And shockingly, despite all the signs that excessive synthetic marijuana use has worsened his psychosis, it appears that Mr. Cole has ████████████████████████████████. (*See* Ex. E, Reentry Plan, at 5).

This time will be different. Mr. Cole's family now recognizes how serious his mental-health issues are—and that his symptoms aren't solely due to being a teenager. And he now has the support of this office: We have proposed a comprehensive reentry plan to support Mr. Cole and his family while he adjusts to life outside prison. Through this wraparound support, Mr. Cole will be able to get the consistency and care he's been sorely missing before.

***Mental health treatment:*** This office has proposed extensive, wraparound mental-health support for Mr. Cole. As soon as he is discharged from prison, he can receive support from St. Marks Institute for Mental Health—an outpatient facility that provides substance use and mental health treatment. In addition to offering psychiatric, psychological evaluations and mental health individual and group therapy, it also offers treatment to address co-occurring disorders, such as

Honorable Paul A. Engelmayer                                        April 14, 2026
United States District Judge                                           Page 16

substance use disorders—which can be crucial for Mr. Cole. (Ex. E, Reentry Plan, at 5).

While receiving immediate care through St. Marks, Mr. Cole and this office can work on longer-term stability. To that end, this office proposes connecting Mr. Cole to New York's Single Point of Access (SPOA) program—an innovative program that provides those with serious mental illness (and all the barriers to treatment that come along with it) individualized care. Through these services, people with serious mental illness can connect to treatment, communicate with providers and get help finding benefits. (Ex. E, Reentry Plan, at 5–6).

Importantly—and unlike traditional outpatient treatment models that largely depend on individuals to independently maintain appointments and navigate services on their own—treatment accessed through SPOA provides a far more structured level of support. Interdisciplinary teams actively engage individuals in the community, offering medication management, crisis response, and coordinated wraparound services. And crucially, Mr. Cole will receive intensive case management that coordinates all aspects of his care. A dedicated case manager will assist with scheduling and attending appointments, monitoring medication adherence, and ensuring consistent engagement in treatment. This level of oversight will reduce the likelihood of missed appointments, medication noncompliance or lapses, or disengagement in services. (Ex. E, Reentry Plan, at 6).

SPOA can also facilitate referrals to dual diagnosis outpatient treatment specifically equipped to address both schizophrenia and substance use simultaneously. Integrated diagnosis treatment is widely recognized as the most effective approach for individuals whose psychiatric symptoms and substance use are interconnected. Research demonstrates that individuals receiving coordinated treatment for both conditions often experience improvements in psychiatric symptoms, reductions in substance use, and better overall functioning compared to those receiving fragmented or separate services. *See* U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration. *Integrated treatment for co-occurring mental health and substance use disorders* (2009), *available at* https://library.samhsa.gov/sites/default/files/ebp-kit-building-your-program-10112019.pdf

***Family support:*** Now that Mr. Cole's family fully understands the extent of his mental illness, they can provide a crucial source of support and stability. Mr.

Honorable Paul A. Engelmayer                                    April 14, 2026
United States District Judge                                        Page 17


Cole will be living with his brother Keon, to whom Mr. Cole is particularly close:
Keon explains that he is "one of the only people" who is able to get through to Mr.
Cole. As Keon puts it:

> I just want you to know that he has a very strong support network on the
> outside. He has people willing to help, even take days off of their jobs to make
> sure Godfrie is well. We all came to his plea court date and we just want him
> to be good and get the mental health care he really needs.

(Ex. B, Letter of Keon Cole).

### Conclusion

Mr. Cole is only 25 years old, and has lived the last decade-plus of his life in
the throes of severe mental illness. Regardless of his ultimate sentence, he will be
released at some point, and his sentence should ensure that he is in the best
position to succeed when he does reenter the community. Given the harsh
conditions he's already endured, and the inability of the BOP to provide full
treatment for his ▮▮▮▮▮▮▮ an extended prison term will not provide that
assurance. I therefore respectfully request that you impose a term of 48 months'
imprisonment, to be followed by 3 years of supervised release.


                                        Respectfully submitted,


                                        *Siobhan C. Atkins*
                                        Siobhan C. Atkins
                                        Assistant Federal Defender
                                        Federal Defenders of New York
                                        (212) 417-8793

cc:    AUSA Brandon Harper

# EXHIBIT A

Dear Judge,

My name is Anne Cole and I am Godfrie Cole's mother. I grew up in West Kingston Jamaica but all of my children were born in the United States. I want to tell you about my son, Godfrie, before he is sentenced.

I tried my best to make sure my children had everything they needed. Godfrie's father was deported before he was born, but they still talk and have a good relationship. But even from Jamaica, his father will talk to Godfrie sternly to try to set him on the right path. I always made sure my children lived in a nice house, never the projects. Godfrie grew up in a loving home not just from me, but from his grandmother too. His father's mother loved him to death and would give him money when he asked.

Godfrie's kindness is my favorite quality of his. He was always kind to older people on the road, he would buy them coffee or things like that. If he sees someone struggling, he would try to help them. But growing up, Godfrie's been around people that he wasn't supposed to be around. He was the quarterback in grade school and was very good at it. But he would hang around the wrong kids and would end up in and out of jail. When he was younger, I sent him away to a group home for a while and when he came out, he had changed a bit but then started back down the same road again. But this time around with this case, I think people messed with his head. There was a day a few years ago, before this case, when Godfrie was out the house for a while and we couldn't find him. His brother, Keon, went out looking for him and when he found him, Godfrie was spazzing out. Apparently, the person Godfrie was smoking with died that day from what they were smoking. I thank God that he saved my son's life.



This whole case has been such a difficult experience for us. He has a twin, Angel, and every birthday is full of crying because he's not around for them. It really hurts her and Keon because they can't all be together.

My son just needs some mental health treatment and medication to keep him calm. He also needs to do things that he loves to do like exercising, boxing, making music and playing basketball. I'm his mother and I'm telling the truth about my son. I love him and I want the best for him. I want to see him outside, not behind bars. He's too young and hasn't even gotten the chance to enjoy freedom because every time you look around he's locked down. He knows he has to stop, but he also needs a lot of counseling and would have to go to programs to get the help he needs and where he can be active and focused.

I'm 60 years old and for me to see Godfrie the way he is now, I just can't do it. My son has become a completely different person. Now, he's someone where he needs to be treated and cared for almost like an elderly person, but he's supposed to know how to live his life.

I'm happy when he calls from the MDC especially because we went almost 1.5 years without hearing his voice or seeing him because he had been moved from the MDC and we didn't know what was happening. We didn't get a call that they moved him. It was so horrible because if they took my child and killed him or did anything to him, I don't know if I'd know.

I am so glad we have reconnected with him now, and we will be here to  support him once this case is over. When Godfrie wants anything he knows he can call me and especially his brother Keon. He lived with Keon and he always made sure Godfrie was good. If he needed pants that were $300, Keon would buy it for him. We would also be there to help him find a job for him to make his own money so that he can be independent. That's what I want for him.

My son just needs serious mental health treatment and support finding a job so that he can stay focused. If you give him the chance to come home as soon as possible, we will be there to help him any way we can.

Sincerely,

Anne Cole

# EXHIBIT B

Dear Judge,

My name is Keon Cole and I am Godfrie Cole's older brother. My brother is naturally a good person, besides his mental issues he's been going through. I care about him and love him, and I want to take the time to tell you more about who he is.

Godfrie has always been a genuine person. He was fine as a kid growing up. He played sports, he had friends in school, and he functioned like a normal kid. But then one day a few years ago, he was out smoking and I think they laced his weed with something because he started acting completely different after that. ██████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ After that, he was talking about things no one could understand and because he's a big kid, people would be scared of him and didn't know what to do. But I have always stood by my brother and was the one he was living with when he was out. I'm the only one that's been dealing with my brother this closely for the last few years.

████████████████████████████████████
███████████████████████████████
██████████████████████████████
████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████

I don't feel like jail time will help him if I'm being honest. He's been in there long enough and I think he needs to be rehabilitated on the outside. He needs to be around his family and not in jail. He lived with me before and he will definitely have a place to stay with me again after this case. He won't have to worry about nothing, he'll eat for free and will have clothes on his back until he figures out what he wants to do with himself. I take him in as his older brother like I've been doing. I've been trying to keep him out of trouble as much as I can. I'm one of the few people he actually listens to.

I talk to my brother every other day. He doesn't talk about what it's like being in jail, but I know these years haven't been easy on him. Everybody knows the conditions people living in are bad in jail and it's no different for Godfrie. It's absolutely a harsh environment. My brother just needs some help. I just want you to know that he has a very strong support network on the outside. He has people willing to help, even take days off of their jobs to

make sure Godfrie is well. We all came to his plea court date and we just want him to be good and get the mental health care he really needs.

Thank you for reading my letter,

Keon Cole

# EXHIBIT C

Dear Judge Engelmayer,

My name is Angel Cole, Godfrie Cole's sister. I'm writing this letter to hopefully help my brother get home, giving him a second chance of life. He's 25 and still full of so much life if only given the shot at it. He has such a good heart, it's just that sometimes it gets misplaced at times. But I'm hoping that the time he has already been in jail is just enough for him to really have that breakthrough that he needed.

I think it's important for you to know that I noticed my brother struggled with his mental health when he got out of jail after he had been in for about 4 years. He came home and smoked some laced weed which I think played a big part in why he is the way he is now. He just wasn't the same. ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████ It was confusing but I feel that I definitely understand his mental health challenges better now and we all just hope he can get the real help he needs so that he can be a better version of himself so that he can do right and not wrong.

We have missed out on a lot of time together since Godfrie has been incarcerated. I wish we could've had that twin relationship. In my heart, I know that he will make this chance worth it coming back to make a difference and being the Godfrie we all know and love. Judge, I hope that you can find it in your heart to let my twin free to make up for missed time.

I just hope he knows I love him deeply. I may not agree with his decision which put him in this position, but I'll always be there for my brother in a positive way. Also, now that I better understand his mental health challenges, I think it's important that he gets the care he needs when he comes home to help him stay on track to stay on the great path. I will always be here to help him do so.

Sincerely,

Angel Cole

# EXHIBIT D

## Student Profile
## Profile: COLE, GODFRIE



| Mathematics Test History | Mathematics Test (Grade 9) | Test Date: 10/21/15 |
|---|---|---|

**Test Date: 10/21/15**
**Grade:** Ninth 2522  (81)
**District Average Score:** 2436  N: 346

| Score | Ability Estimate |
|---|---|
| Scaled Score | 2522 |
| | SEM: (81) |

**Overall**

Unit Score Range  1300 ——— 3700

Number & Operations
2349–2533–2717

Algebra
2217–2400–2583

Geometry
2372–2555–2738

Measurement
1987–2211–2435

Data Analysis & Probability
2602–2823–3044

**Performance**
Rating

Score  1  NPR  99

National Percentile Ranking  11

Score  <2.0  GLE  >9.9

Grade Level Equivalent (GLE)  5.3

**Narrative**

GODFRIE took our Mathematics performance assessment on 10/21/15. GODFRIE's scaled score was **2522**.

| | |
|---|---|
| Unit Score Ranges | Student's estimated ability in individual topic areas, including standard error of measure. |
| SEM | The Standard Error of Measurement (SEM) measures the extent to which the student's Scaled Score varies from his/her true score. |
| NPR | National Percentile Rank for a student represents the percentage of students within his/her grade level with Scaled Scores below his/her Scaled Score. |
| Lexile | The Lexile Framework for Reading is a scientific approach to reading measurement, providing a common scale for matching reader ability and text difficulty. This allows educators and parents to quickly estimate expected reading comprehension and monitor progress. Tens of thousands of books and tens of millions of articles have Lexile measures, making Lexiles the most widely adopted reading measure today. |
| | The Lexile Measure should be used for reporting to students and for instruction; it is constrained by a developmentally-appropriate grade range. The 'Research' version should be used for research and accountability purposes. |

## Student Profile
## Profile: COLE, GODFRIE



| Language Arts Test History | Language Arts Test (Grade 9) | | Test Date: 11/4/15 |
|---|---|---|---|

Test Date: 11/4/15

Grade: Ninth 2113  (88)
District Average Score: 2425  N: 285

| | Language Arts Test (Grade 9) | |
|---|---|---|
| Score | Ability Estimate | |
| Scaled Score | 2113 | |
| | SEM: (88) | |

Overall

Unit Score Range    1300    3700

Parts of Speech
2076–2249–2422

Sentence Structure
1936–2110–2284

Punctuation
1485–1703–1921

Capitalization
2181–2402–2623

Score    GLE    <2.0    >8.9

Grade Level Equivalent (GLE)    2.1

### Narrative

GODFRIE took our Language Arts performance assessment on 11/4/15. GODFRIE's scaled score was 2113.

| | |
|---|---|
| Unit Score Ranges | Student's estimated ability in individual topic areas, including standard error of measure. |
| SEM | The Standard Error of Measurement (SEM) measures the extent to which the student's Scaled Score varies from his/her true score. |
| Lexile | The Lexile Framework for Reading is a scientific approach to reading measurement, providing a common scale for matching reader ability and text difficulty. This allows educators and parents to quickly estimate expected reading comprehension and monitor progress. Tens of thousands of books and tens of millions of articles have Lexile measures, making Lexiles the most widely adopted reading measure today. |
| | The Lexile Measure should be used for reporting to students and for instruction; it is constrained by a developmentally-appropriate grade range. The 'Research' version should be used for research and accountability purposes. |
| GLE | A Grade Level Equivalent (GLE) is a comparison of one student's scaled score to the average scores for various grade levels in the national norm group. For example, a GLE of 4.5 means that the corresponding Scaled Score is halfway between the average 4th grade score and the average 5th grade score. |

PAGE 03/03    P752G    17183221306    14:49    12/15/2015

# EXHIBIT E

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

April 13, 2026

The Honorable Judge Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE: United States v. Godfrie Cole, 24 Cr. 57 (PAE)**

Honorable Judge Engelmayer:

My name is Angel L. Bosques Jr. I am a licensed clinical social worker with the Federal Defenders of New York. I am part of a team of social workers that provides comprehensive support to clients as they address their legal matters. The information presented herein is based on my extensive work with Mr. Godfrie Cole. Mr. Cole and I collaborated on the development of a comprehensive plan that addresses his current challenges, future goals, and needs upon release. Please accept the following report as a re-entry plan for Mr. Cole.

## Background

Mr. Cole is a 25-year-old black male who has been incarcerated for over two years for the instant offense. In the last two years, he has experienced jail conditions that most clients have not. He has been in four different jails and has spent more months in special housing unit or the psychiatric ward than in the general population units of these jails.

████████████████████████████████████████████████████████████████ They followed the recommendations of professionals, but it eventually was out of their hands once he became involved in the criminal justice system. ████████████████████████ ████████████ hey naively believed he would eventually get help from these various systems that he was involved in.

1

Mr. Cole has had some involvement with the criminal justice system since he was a 12-year-old boy. He was removed from his home and placed in a non-secure detention facility when he was 14 years old. From this moment forward, Mr. Cole endured unstable housing for various reasons, including living in treatment facilities and spending time in foster care. For a young boy, being separated from his home, trying to live a life navigating his mental illness, and living in a treatment institution for months are experiences that do not set up a young man for success. Mr. Cole has spent the greater part of his teenage and young adult life in secured and non-secure detention facilities. These facilities have not been successful to treat his mental illness and have only placed the proverbial Band-Aid on a broken bone. The lack of help he received directly led him to act on extreme impulses.

## Mental Illness and Jail

When he was a teenager,



esearch has shown that patients who engage in combined therapies (medications along with talk therapy or cognitive behavioral therapy) have shown improved acute progress and long-term prognosis.[1]

Mr. Cole began to use marijuana at age nine to self-medicate. He escalated to synthetic marijuana use by the time he was twelve years old. Research have found that "an increased use of substances in adolescence may both enhance the risk for developing a later substance use disorder, and also serve as an additional risk factor for the appearance of psychotic symptoms."[2] Mr. Cole and his family believe that his erratic behavior amplified from possibly his marijuana being laced with an unknown chemical. Mr. Cole's brother Keon discussed a painful event that left Keon in tears.

During this time in December 2023, Mr. Cole was supervised by NYC Probation. He was referred to Emma L. Bowen Community Service Center located in Upper Manhattan. He was referred to their mental health clinic.

---

[1] Rajkumar, Ravi Philip. "The Advantages of Combining Therapies in Treating Psychiatric Patients." *Brain Sciences* vol. 14,7 708. 15 Jul. 2024

[2] Khokhar, Jibran Y., et al. "The link between schizophrenia and substance use disorder: A unifying hypothesis." *Schizophrenia research* 194 (2018): 78-85.

██████████████████████████████████████████████
██████████████████████████████████████████████

Unfortunately, ██████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████ These are not theatrics on the part of Mr. Cole, but an extreme call for help.

Mr. Cole was deteriorating mentally while in BOP custody. He was ordered to undergo a competency evaluation at one of BOP's medical facilities in August 2024. He was admitted in January 2025 to Federal Medical Center (FMC) Butner and was restored in October 2025. The nine months at FMC Butner was a long process to stabilize Mr. Cole and to be able to assess him properly without ██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████[3]

Unfortunately, proper psychiatric treatment is something that the BOP is ill-equipped to provide. While the MDC medical and psychological staff tend to him as they can, Mr. Cole requires treatment that the facility has by and large been unable to provide. Instead, Mr. Cole has accumulated a significant number of disciplinary tickets and has spent most of his time at the MDC in the SHU.

Consistency, treatment, and support will be key factors in the success for Mr. Cole. Support will be something new for him because his family struggled to understand how to help him prior to his federal arrest. ████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████ Previously, his family did not follow up with Mr. Cole about any potential appointments or medication management. They left him to his own devices, and they now see that was a bad decision on their part. ██████████
██████████████████████████████████████████████

### The Road Ahead

Re-entry planning is not going to be an easy or quick process. To put it bluntly, Mr. Cole faces a long road ahead of him. However, more incarceration is not the answer. For the nearly two and half years since he was incarcerated, he has

---

[3] Forensic Evaluation from FMC Butner dated 10/14/2025

endured incredibly difficult imprisonment conditions. ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ More importantly, he was isolated from his family where the greater part of his incarceration, they did not know where he was and—because of restrictions placed on inmates in special housing—had no way of communicating with him. There has been a change in Mr. Cole since he sat before Your Honor in January 2026. The difference was that he saw and spoke with his family for the first time in over two years in the courtroom. This provided comfort for Mr. Cole in seeing that his family will be there for him in his most difficult time. He has since returned to general population in the MDC and his communicating with his family more frequently.

It is important to note that Mr. Cole has the support of his family. It is this active support that will be the key difference from when he was on New York City probation. During that time, his family were unaware of the severity of his mental illness and just assumed he would get over it and just go about his life. They are acutely aware of how wrong they were back then and are determined to correct their mistakes now.

Mr. Cole will need intense social services and financial help, both of which will take time. It has been a difficult time for social service programs since COVID related shutdowns and budget cuts. Reduction in staff at the Social Security Administration, cuts to Medicaid benefits, and reduction of social service grants have made it difficult for individuals to get the help they so desperately need in a timely manner. The same will be true for Mr. Cole. The re-entry plan detailed below is meant to support him in the near term and act as a bridge to him eventually obtaining the help he will most benefit from in the future.

*** 

**Community Based Re-Entry Plan**

**Case Management**: Mr. Cole will continue to receive case management services from the social work department at the Federal Defenders of New York. The social work department will continue to provide ongoing supportive counseling services and assist him in working toward achieving the goals outlined in this re-entry plan.

**Family Support**: Mr. Cole's support network is large and are keenly aware of how important they will be when he returns to the community. He will be living with his older brother Keon at **144 West 124th Street, Apartment 4A, New York, New York 10027.** With a steady and familiar residence, Mr. Cole can focus on his health. He will also be supported by his twin sister Angel, his mother Annie, and an extended family that includes his grandmother, aunts, and cousins who are all willing to keep

Mr. Cole on track with his mental health needs. Keon has been instrumental in getting his siblings, mother, and extended family on board to be willing to do anything to help Mr. Cole succeed.

**Mental Health Treatment:** St. Mark's Place Institute for Mental Health is in downtown Manhattan. It offers outpatient substance use and mental health treatment. St. Mark's Place is contracted with federal probation and has had a long-standing relationship with their office. The program provides psychiatric, psychological evaluations and mental health individual and group therapy. It also offers treatment to address co-occurring disorders, such as substance use disorders— ████████████████████████████████████ . Following completion of the intake process, Mr. Cole can be assigned a counselor who will work closely with him to address his co-occurring needs. The social work department is available to assist Probation in identifying an appropriate program for Mr. Cole if they feel this is not an appropriate referral.

While in St. Mark's, Mr. Cole can work on a long-term plan for mental health services. Through the New York State Office of Mental Health, New York City offers a Single Point of Access (SPOA) for care coordination, housing and treatment services for people with significant mental health diagnoses.[4] For many individuals with significant barriers to stability, a team of providers who visit the person in the community (Intensive Mobile Treatment) is more appropriate and effective than requiring the individual to report to a clinic at a certain time. The Single Point of Access program helps providers connect people with serious mental illness to mental health services that can accommodate them—a crucial support for someone like Mr. Cole, ██████████████████████████████ and has struggled to obtain long-term care independently. Through these services, people with serious mental illness can connect to treatment, communicate with providers and get help finding benefits that include:

• Non-Medicaid Care Coordination (NMCC): This service is available only for people with a serious mental illness.

• Assertive Community Treatment (ACT): This treatment is for people with a serious mental illness who have high service needs that are not being met in traditional settings. People with serious mental illness who are otherwise unable to connect to community treatment can receive clinical support from an interdisciplinary team.

• Forensic Assertive Community Treatment (FACT): This is available to people with serious mental illness who are eligible for Assertive Community Treatment and have current forensic involvement.

---

[4] https://www.nyc.gov/site/doh/providers/resources/mental-illness-single-point-of-access.page

・Shelter Partnered ACT (SPACT): This is available to people with serious mental illness who are eligible for ACT and reside in an NYC mental health shelter.

・Intensive Mobile Treatment (IMT): IMT provides mobile mental health and substance use treatment and supports to people with serious behavioral health concerns, very complex life situations, transient living situations and/or involvement with the criminal justice system.

Through SPOA, Godfrie will receive intensive case management that coordinates all aspects of his care. A dedicated case manager will assist with scheduling and attending appointments, monitoring medication adherence, and ensuring consistent engagement in treatment. This level of oversight will reduce the likelihood of missed appointments, medication noncompliance or lapses, or disengagement in services.

St. Mark's and The Federal Defenders social work department can help Mr. Cole with the SPOA application process. This can be an arduous and time-consuming process that will most likely take over six months to complete. But once enrolled, Mr. Cole will have access to services that are more tailored to his needs and abilities. It will also open opportunities for assistance in applying for disability benefits.

**Financial Support:** Mr. Cole's history of addiction and mental illness may qualify him to receive supplemental security income (SSI). He has never applied for these benefits previously. He is unable to maintain employment at this time and can receive help in applying for SSI benefits with the assistance of his counselor at St. Mark's or through the care coordination team. The counselor and psychiatrist from the program can complete the SSI application and submit required documentation on Mr. Cole's behalf. If approved, Mr. Cole will receive a fixed monthly income and may be eligible for Medicare benefits, alongside Medicaid. With this fixed income, Mr. Cole will be able to provide for his own necessities as well as making him eligible to supportive housing. Many supportive housing programs require some income from participants to take a portion of it to pay for rent and utilities. Having his own source of money will allow Mr. Cole to focus on his well being and less on trying to find ways to find money to buy food and clothing.

*** 

Godfrie Cole is a young man who ███████████████████████████████ ██████████████████████ His untreated illness is the driving force behind his involvement in the criminal justice system. Thankfully, his family now understands the extent of his mental-health challenges, and they have rallied around him to support his efforts to remain on track with his re-entry. Mr. Cole also now has

6

additional support he lacked earlier: the support of our office's social work department. We help connect our clients with community resources to strengthen their re-entry and reduce the risk of recidivism. We can work alongside Probation and aid Mr. Cole as needed. It is my professional opinion as a licensed clinical social worker that his engagement with the outlined re-entry plan will assist him in living a productive and lawful life.

Respectfully submitted,

/s/
Angel Bosques Jr., MA, LCSW
Client & Mitigation Services
Federal Defenders of New York, Inc.

7

# EXHIBIT F

| Patient Name: | Gender: | Date of Birth: | Age: | Admit Date: | Med Rec #: |
|---|---|---|---|---|---|
| Cole, Godfrie | M | ███████ | 23 | 12/13/2023 | ███████ |

Emma L. Bowen Community Service Center

Upper Manhattan Mental Health Center, Inc.

**Individual(s) Present: Client:**

☒ Yes   ☐ No

**Contact Method** In Person

**Other:**

**Language** English

**Modifiers**

  Mod 1

  Mod 2

  Mod 3

  Mod 4

**Goal Addressed in Session (related to treatment plan)**

☐ Initial   ☒ Continued   ☐ Revised   ☐ New

**Goal Addressed in Session (related to treatment plan):** Mental Health

**Subjective/Complaint** ███████████████████████████

**Compliance with Medication:**

☐ Yes   ☐ No   ☒ N/A

**Side Effects:**

☐ Yes   ☒ No

**Specify:**

**Suicidal/Homicidal Ideas:**

☐ Yes   ☒ No

**Specify:**

**Objective/Mental Status/Theme:**

Counselor met with Godfrie in person for session and infomed him that writer was assigend as his counsleor. Counslero informed him schedule provided by Rafael would remain the same and encouraged him to enage in services as scheudled.

# EXHIBIT G

Caseload Explorer (2007) - Client Activity Listing (r3.10.1)                                    Printed 2/1/2024

# New York City Probation Department                    # Client Activity Listing

1/1/2000 through 2/1/2024

201555686 - Cole, Godfrie

| Officer | Date | Time | Status | Type of Activity | Location |
|---|---|---|---|---|---|
| Hassan, Khwaja | 09/29/2023 | 9:50AM | Complete | Reopen - Folder | |

*new PSI*

| Hassan, Khwaja | 09/29/2023 | 2:29PM | Complete | Contact - Other | |

*The defendant was interviewed on 9/26/23 in the PENS. ADA was emailed for DA's files on 9/21/23, followed by multiple reminders and a phone call. No response yet.*

| Hassan, Khwaja | 09/29/2023 | 2:41PM | Complete | Assessment | |
| Hassan, Khwaja | 09/29/2023 | 2:44PM | Complete | Assessment | |
| Sanchez, Kim | 10/16/2023 | 4:32PM | Complete | Close - CCI | |
| Davis-Sutton, Lisa | 10/17/2023 | 2:35PM | Complete | Disposition | |

*Court Sentence- 5 Years Probation. Imprisonment-6 Months, Mental Health Screening for possible Treatment, MS-$300, CVAF-$25, DNA-$50, Due by 12/15/2023.*

| Davis-Sutton, Lisa | 10/18/2023 | 10:12AM | Complete | Contact - Initial Intake Interview | Office |

*RAW --As per investigations this is not a media case. An E-justice report was generated, there does not appear to be any warrants. Client reported for intake on 10/18/2023. He was convicted of Att. Robbery 2 and sentenced to 5 years Probation, mental health screening for Possible treatment, 6 months imprisonment, and court fees to be paid by 12/15/2023. He has two prior YO adjudications for Robbery 2 and was sentenced to jail time. He had a pending case in Queens County Criminal Court under Docket 3CR-02928-22QN -ACD- last court date was 10/17/23. There is no further information. Additionally, he had another case for Assault 2 in Queens County Criminal Court for Assault 2 under Docket #CR-026961-22QN-ACD-last court date was 10/17/23. In the instant offense the client punched the complainant in the face and took his electric bike. The Conditions of Probation and Conditions of Weapons were*

████████████████████████████████████████████████████

*apartment is in Michelle's name. He has a 11th grade education and states that he was in special education classes while in school. He has difficulty reading and writing. He is unemployed and does not have any income. Client might need to get his mental health stabilized before seeking employment. He denies having any gang affiliations.*

*A DNA sample was collected.*
*His initial LSIR score is (4).*

*He was given an appointment to meet with SPO Cruz in Manhattan on 10/19/2023 at 2:00 pm.*

| Davis-Sutton, Lisa | 10/18/2023 | 3:18PM | Complete | Assessment | |
| Cruz, Pedro | 10/18/2023 | 4:24PM | Complete | SPO Case Directions | |

*This is a newly assigned RAW/CTS Case from Queens County Supreme Court Sentenced on 10/17/2023 to 5 Years Probation, Imprisonment-6 Months, Mental Health Screening for possible Treatment, MS-$300, CVAF-$25, DNA-$50, Due by 12/15/2023. MED 10/17/2028. According to intake, LSI-R SV scored Medium. This case will be assigned to PO Robertson. Assigned PO to follow up with (1) HV to confirm the address on file and Collateral, (2) Inmate Look up as it appears he will be sentenced to 6 months (3) Create VINE and Webcrims account to keep track of Release Date.*

Caseload Explorer (2013) - Client Activity Listing (5.2.0.0)                                    Page 14 of 18

# EXHIBIT H



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 17, 2025

**BY EMAIL**
Hannah McCrea, Esq.
Assistant Federal Defender
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007

Re:   *United States v. Godfrie Cole*, 24 Cr. 57 (PAE)

Dear Ms. McCrea:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Godfrie Cole ("the defendant") to Count Two of the above-referenced Indictment. Count Two charges the defendant with Hobbs Act robbery, in violation of Title 18, United States Code, Sections 1951 and 2, and carries a maximum term of imprisonment of twenty years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for committing a Hobbs Act robbery in the Bronx on or about November 30, 2023, as charged in Count Two of the Indictment, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant. The defendant agrees that with respect to any and all dismissed charges the defendant is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Count Two of the Indictment and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c): (i) a sum of money in United States currency, representing proceeds traceable to the commission of said offense (the

2025.03.12

"Money Judgment"). It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees to make restitution in an amount ordered by the Court in accordance with Title 18 of the United States Code, Sections 3663 and 3663A Pursuant to 18 U.S.C. § 3663A(a)(3). The defendant further agrees to make restitution and that the obligation to make such restitution shall be made a condition of probation, *see* 18 U.S.C. § 3563(b)(2), or of supervised release, *see* 18 U.S.C. § 3583(d), as the case may be. The restitution amount shall be paid according to a plan established by the Court. The defendant will be given credit against this restitution amount for any payments made prior to sentencing, as verified by the Office.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

### A. Offense Level

1. The applicable Guidelines Manual is the November 1, 2025 Guidelines Manual.

2. Pursuant to U.S.S.G. § 2B3.1(a), the base offense level is 20.

3. Pursuant to U.S.S.G. § 2B3.1(b)(2)(B), six levels are added because a firearm was not discharged but was otherwise used during the offense.

4. Pursuant to U.S.S.G. § 2B3.1(b)(3)(A), two levels are added because a victim suffered bodily injury.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 25.

### B. Criminal History Category

Based upon this Office's current understanding (including from representations by the defense), the defendant has two criminal history points.

1. On or about October 17, 2023, the defendant was convicted in Queens County Supreme Court of Attempted Robbery in the Second Degree: Causes Physical Injury, in violation of New

2025.03.12

York Penal Law Section 160.10(2)(A), and was sentenced to six months' imprisonment and five years' probation. Pursuant to U.S.S.G. § 4A1.1(b), this sentence results in two criminal history points.

In accordance with the above, the defendant's Criminal History Category is II.

### C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 63 to 78 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 25, the applicable fine range is $20,000 to $200,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon information not contained in this Agreement that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the

determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that the defendant's entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw the defendant's plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed that the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the defendant's conviction. In addition to any other claims the defendant might raise, the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute.  It is further agreed that (i) the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, any sentence within or below the Stipulated Guidelines Range of 63 to 78 months' imprisonment and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum or any condition of supervised release imposed by the Court for which he had notice, including from a recommendation by the Probation Office in the presentence investigation report, and an opportunity to object. The defendant also agrees not to appeal or bring a collateral challenge of any fine that is less than or equal to $200,000, and the Government agrees not to appeal fine that is greater than or equal to $20,000. The defendant also agrees not to appeal or bring a collateral challenge to any special assessment that is less than or equal to $100. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that the defendant has accepted this Agreement and decided to plead guilty because the defendant is in fact guilty.

2025.03.12

By entering this plea of guilty, the defendant waives any and all right to withdraw the defendant's plea or to attack the defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant), including *Jencks* Act material, material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if the defendant is not a citizen of the United States, the defendant's guilty plea and conviction make it very likely that the defendant's removal from the United States is presumptively mandatory and that, at a minimum, the defendant is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, the defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if the defendant's naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that the defendant has discussed the possible immigration consequences (including removal or denaturalization) of the defendant's guilty plea and conviction with defense counsel. The defendant affirms that the defendant wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw the defendant's guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge the defendant's conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the defendant's guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

2025.03.12

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

JAY CLAYTON
United States Attorney

By: _____
Brandon D. Harper
Assistant United States Attorney
(212) 637-2209

APPROVED:

__/s/Ashley C. Nicolas/BDH_____
Ashley C. Nicolas
Thomas John Wright
Co-Chief, Violent Organizations and Crime Unit

AGREED AND CONSENTED TO:

_Godfrie Steel Cole_____
Godfrie Cole

_1/13/26_____
DATE

APPROVED:

_____
Hannah McCrea, Esq.
Attorney for Godfrie Cole

_1/13/26_____
DATE

2025.03.12